IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
Criminal No. CR19-145 (DWF/LIB)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

DAVID ALLEN NEADEAU,

        Defendant.

**POSITION PLEADING OF DAVID ALLEN NEADEAU**

The defendant, David Allen Neadeau, by and through his attorney, Kevin C. Cornwell, hereby submits his position regarding sentencing taking into consideration the sentencing guidelines range, mandatory minimum sentence, and relevant sentencing factors under 18 U.S.C. §3553(a):

    **A.    The Presentence Investigation Report.**

Mr. Neadeau has no objections to the Presentence Investigation Report.

    **B.    The Applicable Guideline Range.**

It is Mr. Neadeau's position that the PSR correctly calculates the Total Offense Level at 30 and his Criminal History Category of V. Due to his classification as an armed career criminal, the applicable guideline range is 180-188 months.

**I. APPLICATION OF THE STATUTORY SENTENCING FACTORS WARRANTS THE IMPOSITION OF THE MINIMUM SENTENCE ALLOWED UNDER THE LAW**

In the present case, the following factors must be considered when determining what type and length of sentence is sufficient, but not greater than necessary:

1

1. **The Nature and Circumstances of the Offense and the History and Characteristics of the Offender**

   **(a) Nature and Circumstances of Offense**

   Mr. Neadeau acknowledges that his conduct was serious and inexcusable. Fortunately, the handgun was never brandished or in any way used against law enforcement during the on-scene investigation. In addition, nobody was hurt as a result of Mr. Neadeau's possession of the handgun. There were, also, no reports that Mr. Neadeau had, in fact, used the gun in any offense against anyone else. Nonetheless, Mr. Neadeau knew he could not possess it and accepts responsibility for his decision to do so.

   **(b) History and Characteristics of Mr. Neadeau**

   At the request of counsel, Erin R. Hunter, a sentencing advisor with Minnesota Sentencing Alternatives, LLC, met with Mr. Neadeau seven times and talked with collateral sources in order to prepare a detailed Sentencing Memorandum (dated July 10, 2020) which has been filed with this Court (ECF Doc. No.65) contemporaneous with this position pleading.

   Counsel will not simply repeat everything that is in Ms. Hunter's memorandum. It paints a very detailed, in-depth, and thoughtful account of Mr. Neadeau's life from the time he was a small child up to the present day. Of particular note, however, are the enormous struggles that Mr. Neadeau has had to face from nearly the moment of his birth.

   Mr. Neadeau was born on August 3, 1967, in Minneapolis, Minnesota. At the time of his sentencing hearing he will be 53 years old. His life, from the beginning has been filled with turmoil and trauma. Mr. Neadeau spent time growing up between Minneapolis and the Red Lake Indian Reservation. As described by Mr. Neadeau, his

mother was an alcoholic and for the most part, inattentive to his needs as a child.  At the age of seven, he took over the responsibility of caring for his younger siblings.  His father was not a positive adult in his life either.  He describes his father as "a pimp, player, and hustler."  He was also an addict.  Living arrangements when he was with his father were appalling as well.  In short, Mr. Neadeau could not rely on the adults in his life and was left to figure things out on his own at a very early age.

Mr. Neadeau is mixed race - African-American and Native American.  Mr. Neadeau spoke of the inner turmoil this has caused him.  He has struggled with acceptance in both communities and it has greatly impacted him.  As he has aged, he has worked to reconcile his two different heritages – but it has come with great struggle.  Ms. Hunter wrote of the "historical trauma" experienced by people of color and specific instances in which Mr. Neadeau has been impacted by it.  Included are stories he would hear about the horrible things that his uncles endured while at boarding schools including being forced to speak English; being forced to cut their hair (something against spiritual and cultural beliefs) and being beat.

As a teenager, Mr. Neadeau continued to witness and live in extreme turmoil.  He held his friend as he died from an accidental shooting.  Shortly after, two of his friends drowned in a canoeing accident.  Another friend died in a road accident.  A friend of his killed his own father with an axe and nearly killed his mother.  Unspeakable trauma for anyone.  Even more so for a teenager.

Mr. Neadeau moved in with his Aunt Mary when he turned 15.  He described this time as the only time he really felt stability and consistency in his life.  As a result, and much to his credit, he graduated from Red lake High School in May 1986.  At 18, he

joined the Army Reserves.  He also attended Bemidji State on a football scholarship.  He soon found out that the academics were more than he could handle.  In addition, his coaches would berate him for his performance on the field telling him he was "wasting" his scholarship.  As a result, Mr. Neadeau left school and returned to Red Lake.

Mr. Neadeau describes feeling depressed about leaving school and, in order to cope, he developed an alcohol dependence.  He moved back down to Minneapolis to live with his father.  Things did not go well for Mr. Neadeau.  During this time, his father introduced him to cocaine and crack.  The downward spiral continued.

Admittedly, he has spent a large portion of his adult life in trouble with the law and locked up.  His criminal history should be troubling to anyone.  It should, however, come as no surprise.  We are all a product of our upbringing.  Some of us are fortunate enough to be born into a loving and supportive family.  Unfortunately, Mr. Neadeau did not have this luxury.

Ms. Hunter describes Mr. Neadeau as "extremely intelligent, stoic, kind-hearted, [having a] great sense of humor, optimistic, intense, mindful, [a] critical thinker, well read, inquisitive, cautious, humble, guarded, pensive, [having a] strict code of ethics, spiritual, and last but not least, genuine."  Counsel agrees with all of these observations, but would add another – hopeful.  Hopeful for his future with his children, with his fiancé, and with his desire to make a difference.  He is also hopeful that this Court will exercise great compassion in giving him these opportunities by sentencing him to the mandatory minimum 15 years and also running any time imposed on his supervised release revocation concurrently.  Even so, Mr. Neadeau would be in his mid-60's, but it still gives him hope – a very powerful emotion to have while incarcerated.

## 2. The Need for the Sentence Imposed to Promote Certain Statutory Objectives

### (a) To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

As stated already, Mr. Neadeau acknowledges the seriousness of this offense. In coming to this agreement, both parties recognize that the mandatory minimum sentence of 15 years is sufficient but not greater than necessary to meet this sentencing objective.

In addition, Mr. Neadeau has been in federal custody since May 21, 2019. At the time of his sentencing hearing, Mr. Neadeau will have spent nearly 19 months in the Sherburne County Jail awaiting his final fate. The uncertainty he has experienced with what he will ultimately face, over this very lengthy period of time, has been grueling for Mr. Neadeau. Also, the Sherburne County Jail is meant and designed as a temporary holding facility and, accordingly, lacks the quality treatment and programming available to those who are incarcerated with the BOP. Although Mr. Neadeau has tried to make the best of his lengthy detention, Sherburne County generally is not well-equipped to house someone for this length of time.

Also, time spent in any jail, including the Sherburne County Jail, is unsettling, challenging, and often dangerous. In these times, with the rampant spread of COVID-19, time spent in jail has become even more so. Although the pandemic has not overrun the Sherburne County Jail, the threat is there and is very real for every inmate. Indeed, the United States District Court has issued 17 General Orders recognizing the exigent circumstances created by the pandemic. In Sherburne County, counsel is told that inmates only get out for short periods of time during the day and programming has been severely curtailed. Each inmate, including Mr. Neadeau, lives with the increased threat

5

of exposure to COVID-19 on a daily basis. The constant fear of being infected without the ability to be truly quarantined, engage is appropriate social distancing or feel medically or personally safe or cared for, has become a real-life issue for Mr. Neadeau and all of those incarcerated. The relentless spread of this virus, especially recently, is a harbinger of things to come for our state and federal prisons – in spite of all efforts to curtail it.

Our system imprisons people to deter crime, punish those who commit crimes, protect the public, and rehabilitate prisoners who will one day return home. The pandemic has added a whole other factor to consider. Through recent compassionate release efforts, prisoners have been released when they are too old or debilitated to commit further crimes, too compromised to benefit from rehabilitation, or too impaired to be aware of their punishment. For others, such as Mr. Neadeau, incarceration will be an ongoing, living nightmare as this crushing pandemic persists.

The unprecedented hardship that Mr. Neadeau has experienced while waiting 19 months to hear his fate, must be a factor that this Court considers when deciding what sentence is sufficient but not greater than necessary to meet the statutory sentencing objectives. Not only is this the case when considering the appropriate sentence for his ACCA conviction, but also, and equally as important to Mr. Neadeau, whether to run any time imposed on his supervised release violation consecutive or concurrent to that sentence. It is Mr. Neadeau's position that 15 years and concurrent time is enough.

**(b)　　To afford adequate deterrence to criminal conduct.**

It is always difficult to assess the general deterrent effect of our sentencing practices both in state and federal court. If our state and national crime and incarceration

rates are the only measuring sticks, then it can be argued that sentencing practices have very little general deterrent impact.

As for specific deterrence, the empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. See Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"]. And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Mr. Neadeau's likelihood to reoffend upon his release from prison will be greatly reduced by the fact that he will be in his mid-60's upon release even if he is sentenced to the mandatory minimum on the ACCA conviction and concurrent time on his supervised release violation. Of course, he would also face a lengthy period of additional supervised release. By the time of his, hopeful, release in his mid-60's, he most likely will have aged out of his criminal behavior.

**(c)     To protect the public from further crimes of the defendant.**

Again, both the government and defense recognize that 15 years is sufficient to but not greater than necessary to meet this sentencing objective.

**(d)     To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

15 years is more than sufficient for Mr. Neadeau to receive whatever programming he needs to come out of prison prepared to live his remaining years productively and in a law-abiding fashion.

**3.    The Kinds of Sentences Available**

Statutorily, the Court must impose no less than 15 years on the ACCA conviction. Again, both parties recognize and suggest to the Court that 15 years is all that is necessary for this offense. In addition, and significant to Mr. Neadeau's negotiations with the government, AUSA Justin Wesley, agreed to not take any position with respect to whether any time imposed on Mr. Neadeau's supervised release file should be imposed consecutive or concurrent with the 15 years.

With respect to this issue, although § 7B1.3(f) of the United States Sentencing Guidelines recommends consecutive sentences for incarceration terms imposed during revocation of supervised release, it is clear that this decision is left to the discretion of the Court. *See, United States v. Valure,* 835 F.3d 789, 791 (8th Cir. 2016) (district court did not abuse its discretion in making the revocation sentence consecutive to the new sentence); *see also* 18 U.S.C. § 3584(b) (authorizing consecutive sentences but stating that courts "shall consider" the factors of 18 U.S.C. 3553(a) when deciding whether to make a revocation sentence consecutive or concurrent). Indeed, as noted in 18 U.S.C. § 3584(a), "[m]ultiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively." For the reasons already stated above, the sentencing objectives of 18 U.S.C. § 3553(a), will equally be met if the Court decides to run any time imposed following any revocation of his supervised release concurrent to the time imposed on his ACCA conviction.

**4.    The Sentencing Range Established by the Sentencing Commission**

Because the mandatory minimum sentence for the offense of conviction is 180

months, the sentencing range established by the Sentencing Commission is 180 to 188 months.

**5.      The Need to Avoid Unwarranted Disparities**

Without information regarding how similarly situated persons have been sentenced, it is difficult to address this concern.

**6.      The Need to Provide Restitution to any Victims of the Offense**

Restitution is not an issue in this case.

## Conclusion

For the foregoing reasons, Mr. Neadeau respectfully submits that the imposition of the mandatory minimum sentence, consistent with the plea agreement, of 15 years on the ACCA conviction and the imposition of concurrent time on any supervised release violation, will best address and balance all of the relevant statutory sentencing factors. It will also give him hope.

Dated: July 24, 2020                                          Respectfully submitted,


                                                              s/Kevin C. Cornwell
                                                              Kevin C. Cornwell, #023767X
                                                              Attorney for Mr. Neadeau
                                                              102 S. 29th Ave. W
                                                              Suite 206
                                                              Duluth, MN 55806
                                                              (218) 625-3034