1          UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2
    ------------------------------------------------------------
3                                    )
    United States of America,        )   File Nos. 05cr13(1)
4                                    )             19cr145(1)
            Plaintiff,               )             (DWF/LIB)
5                                    )
    vs.                              )
6                                    )   St. Paul, Minnesota
    David Allen Neadeau,             )   September 3, 2020
7                                    )   1:13 p.m.
            Defendant.               )
8                                    )
    ------------------------------------------------------------
9
            BEFORE THE HONORABLE DONALD W. FRANK
10           UNITED STATES DISTRICT COURT JUDGE
            **(SENTENCING & FINAL REVOCATION HEARING)**
11
    APPEARANCES
12   For the Plaintiff:        United States Attorney's Office
                               Justin Wesley, AUSA
13                             300 S. 4th Street
                               Suite 600
14                             Minneapolis, Minnesota 55415

15   For the Defendant:        Law Office of Kevin Cornwell
                               Kevin Cornwell, ESQ.
16                             102 S. 29th Avenue West
                               Suite 206
17                             Duluth, MN 55806

18   Court Reporter:           Lynne M. Krenz, RMR, CRR, CRC
                               Suite 146
19                             316 North Robert Street
                               St. Paul, Minnesota 55101
20

21

22        Proceedings recorded by mechanical stenography;
    transcript produced by computer.
23

24

25

1                     **P R O C E E D I N G S**

2                        **IN OPEN COURT**

3          (Defendant present)

4              THE COURT:  Why don't we have introduction of

5     counsel first.  We can start with government's counsel then

6     move over to defense counsel.

7              MR. WESLEY:  Justin Wesley for the government,

8     Your Honor.

9              MR. CORNWELL:  Kevin Cornwell for Mr. Neadeau.

10             THE COURT:  And good afternoon to each of you,

11    including to you, Mr. Neadeau.

12             And the -- a couple of things before I suggest how

13    we proceed with the case.  When counsel talks, you're free

14    to leave your mask on or off as you address the Court,

15    either way is fine, the lawyers do it each in both ways.

16             And then, secondly, something that's quite common

17    in state court, it was when I was a state judge many, many

18    years ago, but the -- and I think it still is, it's very

19    rare in federal court where -- meaning that lawyers, either

20    because they're required to or always stand up when they

21    address the Court, you don't -- I'd urge you not to stand

22    up, even though sometimes lawyers are uncomfortable doing

23    that, so that you can talk close to the microphone and

24    everybody can hear and my court reporter can get everything

25    down, and so I would urge that, as unusual as that is, but

1    these are kind of unusual times we're living in and so we'll

2    proceed in that way.

3            Then having said that, I would make the following

4    suggestion how I proceed, not unique to this case.

5            That the Court will first check in with counsel

6    with respect to whether there's any -- anything that counsel

7    want to be heard on, there doesn't appear to be any issues

8    on the application of the advisory guidelines and the

9    mandatory minimum sentence of 180 months, but I'll confirm

10   that with the counsel.

11           Then once I confirm that then we can move on to --

12   I'll hear argument from defense counsel on what they think a

13   fair sentence could be and absent objection, but I think

14   you've both addressed this in your written submissions.  You

15   can also address that since you know it will be -- it's

16   likely 180 months, because that's the mandatory minimum on

17   the sentence before the Court on the violation hearing, you

18   can address that at the same time, and you both have in your

19   submissions to the Court, as well.

20           Then at that time, Mr. Neadeau, as you may be

21   aware, you have a right to make any comments to the Court.

22   You don't have to say anything if you don't want to.  As you

23   know, some defendants talk at these hearings, some don't.

24   The only rule that does not change from one case to another

25   is the Judge cannot use it -- cannot use it in a bad or

1    negative way if you don't want to add something to what your
2    attorney has said.  And then subject to any
3    response/rebuttal I'll move on to government's counsel on
4    any positions they have.
5             If we proceed in that order, is that acceptable to
6    the government?
7             MR. WESLEY:  It is, Your Honor.  Thank you.
8             THE COURT:  To defense?
9             MR. CORNWELL:  Yes, Your Honor.
10            THE COURT:  And then I'll acknowledge for the
11   record, in addition to the written memorandums I've received
12   from each counsel, I will also acknowledge the receipt of
13   the 23-page report from Erin Hunter entitled, A sentencing
14   memorandum, based upon an interview that was, of course,
15   also done by Zoom, with Mr. Neadeau.  I've had a chance to
16   read that as well.
17            And so with that in mind, I'll begin with the
18   government.  Any objections to the computation under the
19   guidelines?
20            And I mean, frankly speaking, they came out
21   consistent with the -- what was contemplated in the Plea
22   Agreement, but anything further on the advisory
23   guidelines?
24            MR. WESLEY:  Nothing further, Your Honor.
25            THE COURT:  For defense counsel?

1            MR. CORNWELL:  No, Your Honor.

2            THE COURT:  Then the Court finds that based upon

3    adjusted offense level of 30, and a Criminal History

4    Category of V, that creates an advisory sentence of 180 to

5    188 months, and notably a mandatory minimum sentence of 180

6    months.

7            A supervised release period of two to three years.

8            A fine of $30,000 to $250,000.  I'll be imposing

9    no fine today.

10            And a $100 special assessment.

11            And then separate from that, the advisory

12    guidelines on the -- since Mr. Neadeau is on probation for a

13    similar charge, actually I was the sentencing Judge back in

14    2006, that the advisory guideline there is 51 to 63 months.

15    And, admittedly, there will be an issue of, well, apart from

16    what the advisory guidelines are, the same guidelines

17    suggest a consecutive sentencing rather than concurrent,

18    separate from the issue of if it should be something other

19    than 51 to 63.

20            So with that, I'll hear from defense counsel.

21            And I will indicate, to the extent -- Stephanie

22    Thompson who's been the supervising agent, has my permission

23    not to appear.  We didn't pull up the big screen here for

24    her to appear, but myself, and Ms. Thuringer, we both had a

25    20-minute conference with her before we came to the court.

1    So she's familiar with it going on, currently, and we just

2    finished a conference call with her.

3              Whenever you're ready, counsel.

4              MR. WESLEY:  Thank you, Your Honor.

5              Before I begin, I just want to acknowledge some

6    folks who are here.

7              THE COURT:  All right.

8              MR. CORNWELL:  Sitting behind me are Mr. Neadeau's

9    children, as well some other family members, as well, and

10   some of his friends.  So they've shown up here, I think, in

11   larger numbers than I anticipated when I spoke to the clerk,

12   but I'm glad that they're here, I know that he's glad that

13   they're here, as well.  So they offer their support to Mr.

14   Neadeau, of course.

15             I do want to, of course, acknowledge Ms. Hunter's

16   assistance in providing her very, I guess, personal and

17   intimate look into Mr. Neadeau's life.  Very detailed.  I

18   find it very interesting.  It's the first time I've used

19   her.  I hope it was helpful to the Court.  I know it was to

20   myself and to Mr. Neadeau, so I do want to acknowledge and

21   thank her for what she did.

22             It is our position as stated, Your Honor, in the

23   sentencing memorandum that was filed that 180 months is

24   sufficient but not greater than necessary to accomplish the

25   sentencing factors set forth in the statute.

1          It is also our position that any time that is

2     imposed as a result of this supervised release violation run

3     concurrent.  Although the Court is correct in that the

4     guidelines do recommend, or suggest, or even make it

5     mandatory that any time run consecutive.

6          THE COURT:  Well, I think you're correct in your

7     memorandum, I doubt the government will disagree, that

8     mandatory, only to the extent that it's suggested by the

9     guidelines, but under the -- under the 3553(a) factors the

10    case law, I think that obviously, whether it's 51 to 63,

11    something more than that, less than that, concurrent,

12    consecutive, is the Court's call.

13          So I'm -- until somebody persuades me otherwise,

14    I'm not going into the hearing to saying, well, nothing

15    makes any difference.  The Court must -- must give a

16    consecutive sentence, period.  And I -- that's not the case.

17    Although it is true the -- that's what the guidelines --

18    there's no case law saying, Judge, you can ignore the

19    federal statute and the guidelines say you must give it no

20    matter what.  And that's -- because this isn't the first

21    case in this circuit or other places where that's -- that

22    issue's come up.

23          MR. CORNWELL:  Right.  Yep.  And, of course, our

24    position is well stated that we are asking the Court to

25    exercise its discretion and run any time concurrently on the

1     supervised release violation.

2            Again, as the Court indicated, I know the Court

3     has reviewed the sentencing memorandum, as well as Ms.

4     Hunter's memorandum as well, so I'm not going to rehash

5     everything in great detail but there are some things I want

6     to discuss with the Court that I find particularly

7     significant and worth noting.

8            I think it's clear in reading through Ms. Hunter's

9     memorandum that Mr. Neadeau lived a life full of struggles.

10    I don't think that's surprising.

11           She describes him as being kind of torn between

12    two cultures.  He is mixed race.  He is African American and

13    Native American.  And I think she spent a great deal of time

14    with him and I think he spent a great deal with her talking

15    about that.  And the inner turmoil that it caused him as a

16    child, and as an adult, and continues to cause him, really,

17    to some extent throughout his life.  She talked about him

18    being bullied, and ridiculed in school and not quite

19    feeling as if he felt squarely belonged within either

20    culture.  And I think that struggle continues today.  But as

21    he continues to get older, I think he's taken a much more

22    spiritual look at that issue.  And I think he's responding

23    to it.

24           And he's come to more peace with that issue,

25    although I -- it's difficult for most of us to ascertain

1    what that would entail, but that is, I think, a significant

2    issue in his upbringing and continues to be.

3          It's also clear that he had a very, I think,

4    tumultuous upbringing.  Again, not surprising.  But there

5    was a relatively unstructured family situation that he grew

6    up in, spent time bouncing between various family members

7    and various communities.  Whether it was in the cities or up

8    in Red Lake, he was bouncing back and forth between folks.

9          He witnessed substance abuse as a child.  He

10   witnessed violence as a child.  And really -- and this isn't

11   a critique to anybody who's in the courtroom, his mother --

12   his mother's not here, but I think his youth and his

13   upbringing lack stability and the guidance that, of course,

14   is so crucial as we grow up.

15         I think he mentioned to Ms. Hunter that really the

16   only time he felt any real sense of stability was when he

17   lived with his aunt, his Aunt Mary.  He was able to, to his

18   credit, finish and graduate from Red Lake High School, join

19   the Army Reserve and then attended Bemidji State for a short

20   period of time to play football there.  Unfortunately things

21   didn't work out for him there and that's where things, I

22   think, started to really spiral.

23         I think he moved back in and started to associate

24   with folks that were negative for him.  He started using,

25   more heavily, controlled substances, alcohol.  Things

1    spiralled down for him.  He was depressed after he left

2    college.  I think he saw that as a great opportunity for

3    him.  And not surprisingly, all these things in combination

4    really bring us here today.

5            In hearing all of these things and in reading

6    through his life history, life story, I guess one wouldn't

7    be surprised if Mr. Neadeau was angry and bitter about the

8    situation, about people in his life.  And it's especially

9    true, I think, when we consider that he spent nearly

10   19 months in the Sherburne County Jail, which is challenging

11   in the best of times but, of course, with COVID now,

12   probably nothing short than a living nightmare given the

13   fears that are surrounding COVID.

14           I think he, as well as everyone in the Sherburne

15   County Jail at this time, but he, especially given the

16   length of time he's spent there, it's really been an

17   unprecedented hardship on folks and him especially included

18   because of the length of time.  He's has sat there, again,

19   almost 19 months in the Sherburne County Jail.  He is not,

20   however, bitter.  He is not angry.

21           The first time I met him and ever since I've dealt

22   with him he's been very reserved, very respectful, very

23   appreciative of everything that people have done for him.

24   He's not making excuses.  He hasn't done that since day one.

25           He is -- and I know Ms. Hunter used a bunch of

1        words to describe her impressions of him and, again, I would

2        agree with all of them, and I use my own word as mentioned

3        in the memorandum, Your Honor, and it's hopeful.  And that's

4        what I really see him as.  He's hopeful that he can

5        reestablish at some time the relationship with his children

6        who, again, are here and are reaching out to him.

7                I think he's hopeful that he can mend old

8        relationships with his mother, particularly, and with

9        siblings.  He can establish new relationships, as well, Your

10       Honor.  I think he's hopeful of that.  And, of course, he's

11       hopeful that he's going to be given that opportunity by the

12       Court to accomplish all of these things.

13               As I mentioned, the imposition of 15 years,

14       180 months is a very sufficient or significant penalty,

15       especially given the fact that he's 53 years old at this

16       point.  Even in the best of situations, if he's only looking

17       at 180 months, he's looking at release in the early 60s,

18       perhaps, to mid-60s.

19               It's also worth mentioning, Your Honor, that as

20       part of the Plea Agreement the government has agreed to

21       remain silent as to how the Court should handle that issue

22       in terms of whether the time should run concurrently or

23       consecutively on the supervised release violation.

24               Again, we've indicated in the memorandum why we

25       believe it would be most appropriate for the Court to

1    sentence him concurrently.  The government has indicated it

2    believes 15 years is sufficient but not greater than

3    necessary on the underlying offense and is making no

4    argument on supervised release.

5            Your Honor, I'm asking Court to give him an

6    opportunity and a reason for hope.  Again, 15 years is

7    sufficient but not greater than necessary to accomplish all

8    the sentencing factors.

9            We are asking the Court to exercise great

10   compassion and understanding in running any time imposed

11   concurrently on the supervised release violation.

12           The final thing that he asked me to ask the Court

13   to consider is that although the Court only makes

14   recommendation, of course, to the Bureau of Prisons, he's

15   asking the Court to recommend a placement at FCI, somewhere

16   close to Minnesota.  Whether that happens or not remains to

17   be seen, but he's asking the Court to consider that.  Thank

18   you.

19           THE COURT:  If I may ask you, counsel, before I

20   ask if your client wishes to -- obviously one of the issues

21   that's kind of in the air here, and I would be asking it --

22   I would be asking this question even if I hadn't been the

23   sentencing Judge back in 2006, and that is someone might be

24   saying, obviously, obviously, he's 53 years old.  Now, you

25   might be saying, well, Judge, it was 15 years back then,

1    too, and here we are back again on a similar weapons charge

2    and he's still deal with alcohol, drug, and other mental

3    health issues.

4            What's most important for me to know about that?

5    And, obviously, it was covered to some extent in Ms.

6    Hunter's report and your memorandum but I thought, well,

7    since it's kind of in the air here, I'd thought I'd ask it.

8            MR. CORNWELL:  As I read through the supervised

9    release documentation, it appears to me as if he did fairly

10   well for a period of time, for I think over a year he was --

11   he was doing well.  What caused him to slip back into this,

12   I suspect, was some drug issues, some controlled substance

13   issues.

14           Of course, as I noted, any offense is serious.

15   This offense thankfully didn't involve anybody who was

16   injured.  I think the weapon was found in his vehicle.  It

17   wasn't used, it wasn't brandished, it wasn't threatened to

18   be used against law enforcement.  It was found underneath a

19   backpack or something similar to that as I recall.  So it

20   wasn't really used in the commission of the offense to

21   frighten or to harm anybody.

22           Again, he did well on supervised release.  I think

23   the position is -- imposition of consecutive sentencing, for

24   all intense purposes, could be considered almost a life

25   sentence.

1           If the Court were to impose even the low end,

2    51 months consecutive, he's looking at probably 70,

3    somewhere close to there, at least.

4           So, again, I would simply indicate that he did do

5    well for a period of time.  He was working.  Apparently he

6    remained chemical free, or relatively chemical free, during

7    that period of time.

8           He can make it, there's no question in my mind he

9    can make it.  He's a brilliant person.  He's very smart,

10   very intelligent, and well-spoken in everything.  He can

11   make it, Your Honor, we're just asking the Court to -- to

12   recognize his success while on supervised release, to some

13   extent, the factors of the offense itself and his age, as

14   well, Your Honor.

15           THE COURT:  Do you know if your client wishes to

16   make any statement to the Court?

17           You have the rights, Mr. Neadeau, to make any

18   statement.  As you're probably aware, you don't have to say

19   anything.  As I said earlier, some defendants talk at these

20   hearings, some don't.  It's entirely up to you.

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  And if you can kind of speak close to

23   the microphone because it's not -- it's not a fancy

24   entertainment mic, so you'll have to kind of have it close

25   to you, otherwise everybody can't hear and we can't get it

1    down, so.

2          Okay.  You can go ahead and state anything you'd

3    like.

4          THE DEFENDANT:  Yes.  Can you hear me, Your Honor?

5          THE COURT:  I can.

6          THE DEFENDANT:  Thank you.

7          My daughters are here today.  I call them the

8    three amigos.  My twin boys, my daughter-in-law.  My boys

9    are young fathers.  My son, Jared, just recently had his

10   first son.  Named him after me, as well as my other son.  I

11   have another grandson that's named after me.

12         I think about that, you know.  You know in my

13   mind, you know, I'm not deserving of that, and yet my

14   children, you know, had done that to honor me in their own

15   way.  And I look at that as them not giving up on me, you

16   know.

17         I've thought long and hard about what I was going

18   to say today, Your Honor.  Tried a couple hundred times to

19   sit down and write and it never worked out.  And I just

20   decided that when this day comes, you know, I'm just going

21   to speak from my heart, you know, because that's the easiest

22   thing to do.

23         On the way here, you know, I haven't seen the

24   outside in a while, and seeing the free world made me think

25   of, you know, that first day that I was released from prison

1    after doing twelve and a half years.  And, you know, it was

2    the greatest day of my life, you know, to be free again.

3           I made my way to Crookston, a small rural town in

4    northern Minnesota.

5           THE COURT:  I've been there a number of times.

6    I'm familiar with it.

7           THE DEFENDANT:  Figuring I was going to make a new

8    start and try to do it, you know, somewhere where things

9    were slow, you know, and not the hustle and bustle of the

10   big city, you know, not too much of the craziness of the

11   reservation, you know, just a place to start fresh, you

12   know.

13          I got to the halfway house -- well, actually it

14   was a county jail but better than prison.  And the first day

15   I was there was orientation, things like that.  And the

16   second day was they put an ankle monitor on my ankle and

17   told me I could leave for a couple hours.  So okay.  Where

18   am I going to go?  Well, maybe you can go up to Walmart or

19   something, go shopping and, you know, get some hygiene

20   products, or whatever, but you're free to go for a couple

21   hours and take care of some things.  Okay.

22          How do I get there?  You know.  They give me a

23   little map, pretty easy to get there.  Just two miles to

24   your right and one mile to your left and you'll run right

25   into it.  So I begin my journey.  I'm walking on this rural

1    highway and, you know, just, the beautiful scenery,

2    something I haven't seen for a long time, you know.  And

3    then this big truck drives past me and I felt the wind, you

4    know, so I figured I better start paying attention otherwise

5    I'm going to get -- I might end up being roadkill.

6         Well, I made it.  I made it safely to the Walmart.

7    And as I go to the door to go to grab the door, it opened

8    up.  I forgot doors do that.  And so I walk into the Walmart

9    Your Honor, and I'm standing there and then I just was

10   overwhelmed.  Like I just was like stuck, you know, and I

11   realize that I stopped breathing so I had to tell myself to

12   breathe again.

13        Well, I decided to step back out.  So I walked

14   back out and got myself together and then decided that I was

15   going to give it another try.  So I turned around and I went

16   back into the Walmart.  And I'm standing there again and I

17   had to remind myself to breathe.  And this young girl walks

18   up to me, and she must have noticed that something was going

19   on with me, so she walks up to me and she patted me on the

20   shoulder and she asked me if I was okay and if there was

21   anything they could do to help me.

22        And so I says to her, I says, yeah, can you tell

23   me where the coffee is?  So she brought me to the coffee

24   aisle.  And I'm standing there looking for this yellow bag

25   of coffee called Keefe that they sell to us in the prison

1    commissary.  Been drinking it for twelve and a half years.

2    So I'm standing there and I see all these coffee brands, and

3    all of these creamers, and pouches of things, but I couldn't

4    find my coffee.  And, well, anyway, I realize I had been

5    standing there for about a half hour and only got two hours

6    to get back to the jail, so I just gave it up.

7            I walked out of the Walmart, didn't buy nothing

8    and I walked back to the jail.  It was quite a -- quite an

9    adventure, quite an experience, but I knew that I needed

10   some help.  So I called my mom and my mother came and she

11   took me to Walmart.  And then so I had to pay attention

12   because my mother's trying to show me how this is done now,

13   trying to show me the signs and, you know, boy, you can

14   read, I know I taught you how to read.

15           So it went well, you know.  My mom kind of showed

16   me how to shop at Walmart and Walmart became one of my

17   favorite places to be.  Every chance I got, I was going to

18   Walmart.  And if you need anything I got you.  I know where

19   it's at now.

20           Well, that was my transition, you know.  And, you

21   know, things were going well.  I had a good job.  I had, you

22   know, good people that were there to help me along the way.

23   And I brought my family up and we got an apartment and

24   brought my granddaughter up, you know, I got to be a

25   grandfather for about a year, you know.  And I was going to

1      give that little girl anything she wanted.  You know, I was
2      going to give her everything that I failed to give my own
3      daughters and my sons.
4            She was a little gamer.  She loved playing on her
5      little tablet thing, you know.  Well, I brought my son up,
6      as well.  Well, he's a gamer, too, so.  He was pretty good.
7      Kids and their games, you know.  Well, I had to give my
8      daughter back, my granddaughter back, you know, her mother
9      loves her, too.  You know, it was just temporary.  Well, my
10     granddaughter wanted to go back with her mom anyway because
11     she got tired of her grandpa always pestering her, trying to
12     get her to play outside.
13           During that time, Your Honor, you know, life was
14     -- it was wonderful, you know.  I got to experience a lot of
15     different things, you know, that normal people do everyday,
16     you know.  I got some freedoms after a while and the ankle
17     monitor came off, and I got to, you know, travel and, you
18     know, reunite with family, and unite with new family
19     members, you know.  My children, my grandchildren, birthday,
20     and a couple of Christmases.
21           And even at my job, you know, I was offered a
22     supervisor position.  Well, I didn't want to take the
23     supervisor position and that means I got to babysit other
24     people.  And I was doing that for a lot of years in prison
25     and I just didn't want to do that no more.  I just wanted to

1    just go work, and do my job and go home to my family, you

2    know.

3              I'm very remorseful.  I can't find no words to

4    express, you know, how remorseful I am sitting here today

5    and how apologetic I am, you know, that my family has to be

6    here.  And to, you know, all of the folks out there that I

7    got to meet along the way in my community and in my

8    workplace and -- you know, there's a lot of goodness out

9    there in the world and, you know, and I got to experience

10   that, you know.

11             It's unfortunate, you know, all of the things that

12   are happening today, you know, in our country, throughout

13   the world with the pandemic and, you know, this civil

14   unrest.  And it's just really sad, you know, that I can't be

15   where I'm supposed to be with my children and my family.  My

16   young sons, you know, are -- they're young fathers, and

17   they're doing a very -- very good -- very phenomenal job at

18   being young fathers right now.  My daughters are being

19   wonderful mothers.  And I believe that what my children are

20   doing today, you know, they're -- these young people now

21   today are changing the world in their own ways and I believe

22   that my children are going to finally break that vicious

23   cycle, you know, that has ravished my family for

24   generations.

25             For me, to no longer be selfish, you know, in the

1    very beginning when this happened, you know, I thought about

2    not wanting to do this anymore, whatever it was.  And, you

3    know, I thought about making selfish acts but I decided

4    that, you know all of the selfish things that I have been

5    doing all my life, that would be the worst selfish thing to

6    do.  I had to think about my children and my grandchildren,

7    you know, and my mother and my relatives.  And so I decided

8    to push forward and to not give up on myself.

9           There's this story, I can't remember where -- I

10   don't know where it came from, but two mice fell into a

11   bucket of cream and the one mouse quickly gave up and

12   drowned.  And the second mouse refused to give up and it

13   struggled so fiercely that it turned the cream into butter

14   and it crawled out.  So, Your Honor, I'm that second mouse.

15          And to my mother who could not be here today

16   because she has to be with my brother who has skin cancer

17   and it came back, and so he started his first round of

18   chemotherapy, and so my mother needed to be with him today.

19   And when I spoke to her this morning she felt bad about it.

20   And she apologized to me that she couldn't be here with me,

21   and it just broke my heart because, you know, no mother

22   should have to be in a situation where they have to decide

23   whether they should be with one son who is in the hospital

24   fighting cancer or to be with her other son who is being

25   sentenced in federal court.  And that is the situation that

1    I have created for my mother.  There's nothing else that can

2    be more heavy on my mind and my heart today.

3             And as I -- as I sit here before the Court, Your

4    Honor, and we had done this before, and I know that the

5    first time you showed great compassion for me.  I am not

6    even suggesting on what I would like for you to do, but I

7    would say that as I sit here a humbled man, and I know that

8    the judicial process must take its course.  I will continue,

9    regardless of what happens here today, to never give up on

10   myself, not give up before the miracle happens.  I got some

11   work to do and I've already started that work.

12            There's been a lot of mental issues that I have

13   tried to ignore over the years, but I know now that, you

14   know, there's things with mental health that make all the

15   difference.  And so I begin that process already.  The

16   doctors have, you know, helped me, and with medication, and

17   so things they feel like they're -- they feel already like

18   it's making a difference for me in my life, in my day-to-day

19   activities.  And especially being in jail, that it helps me

20   to cope.  And so I will continue to find my way back to my

21   family.

22            And I would like to thank you, Your Honor, for

23   giving me the opportunity to speak.

24            THE COURT:  One question before I go to -- any

25   further thing, at least subject to rebuttal, by defense

1  counsel?

2          MR. CORNWELL:  Pardon me, Your Honor?

3          THE COURT:  I'm going to go to government's

4  counsel, unless you like anything further, but I'll give you

5  a chance to respond if you like in a moment.

6          MR. CORNWELL:  Fine, Your Honor.

7          THE COURT:  One question for you, Mr. Neadeau, and

8  that is, obviously, separate from the prison sentence

9  itself, one of the recommendations that I'd like to make is

10  for you to have -- apart from the mental health screening

11  and the medication issue is recommending that you

12  participate in the Residential Drug Alcohol Treatment

13  Program.  I can't make you do that, but I'm hoping you'd be

14  willing to do that.  Are you willing to do that?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  All right.  I'll hear from

17  government's counsel and then I'll come back to defense

18  counsel then before I make any decisions.

19          MR. WESLEY:  Your Honor, we'll just simply say

20  that the government believes that the 180 months is a fair

21  and just sentence in this case and that per the agreement,

22  we are remaining silent on the 2005 case.

23          THE COURT:  Anything further by defense counsel?

24          MR. CORNWELL:  No.  Not much to rebut there, Your

25  Honor.

1             THE COURT:  Okay.

2             Well, I'll go ahead.  And I'll just thank everyone

3      for their written submissions they made.  I'll respond

4      briefly to what's been said and also to the written

5      submissions and then announce the sentence.

6             And then also I will stop and discuss, once I've

7      imposed a sentence, explain how we typically handle the

8      recommendation for facility.  Most federal judges, including

9      me, would like to pick the facility.  The Bureau of Prisons

10     is probably glad we can't and then they get to select the

11     facility, so.

12            As probably I know the lawyers in the room know

13     and probably others do, too, but separate from the guideline

14     issues and the mandatory minimum issues, obviously, there's

15     the MM word, or mandatory minimum, means that separate from

16     the guidelines the Court can't go below the 180 months.

17     We'd probably be in the situation of something in that area,

18     with or without the mandatory minimum, consistent with other

19     similar cases, but the -- even assuming everything is

20     exactly as it's been stated in the reports, including the

21     report from the sentencing specialist who submitted her

22     report, and for the record, again, that's Ms. Hunter.

23            But as most people know, the definition of a fair

24     sentence is what is that sentence that will promote respect

25     for the law, sufficient but not greater than necessary to do

1    that, will address the human being in front of me, will not

2    create any unwarranted sentencing disparities.  And then we

3    get to, and I'll speak in plain language rather than use the

4    legal terms deterrence, because there's kind of two types of

5    so-called deterrence, but it really is promoting respect for

6    the law and saying to a community and saying to a society,

7    well, when this conduct occurs, here's the -- here's the

8    punishment, or the consequence, so I'll go through that

9    now.

10          And, actually, to the extent it's even relevant, I

11   went back and reread the 2006 report.  And, obviously, back

12   then I remember -- in fact, there's a quote in the report

13   from, and maybe you said this at the sentencing back then

14   too, you had hoped you'd be able to change your life when

15   you came out of prison.

16          And the -- I'll say something to you, Mr. Neadeau,

17   that I do to many individuals, and I think I would say it

18   even if I didn't have five daughters, two sets of twins,

19   actually.  And through no fault of my parents they were --

20   because I grew up on a little farm in southeastern Minnesota

21   and my dad had to quit school in eighth grade and work the

22   farm, even though he was the youngest of seven kids.  And

23   then out of law school I went up to the Iron Range and

24   worked on the Fond du Lac and the Red Lake Indian

25   Reservations during the 22 years I was up there.

1          But the -- and I'm not claiming that as a white

2     male growing up in America that I understand some of the

3     obstacles of minorities, especially people, whether it's

4     Native American, African American, other communities, I

5     understand -- but hopefully I've learned a few things along

6     the way.

7          And so that even though I can't totally understand

8     those, even though I kind of grew up in kind of the

9     post-active Civil Rights movement.  And I'm no expert and

10    sometimes I put this up -- I went through alcohol drug

11    treatment, that's my 43-year medallion, because I'm an older

12    fella back in the mid-to-late 70s and still volunteer and

13    I'm active.  And I'll talk a little bit about that in a

14    moment about working a spiritual program, or the 12-step

15    program, taking things a day at a time, and getting into

16    that right group and so, because I think that -- that's a

17    key for a lot of individuals, and I'll get to that in just a

18    moment.

19         But the thing is, I think -- and I thought this in

20    part back when we met in 2006, but you've kind of made it

21    clear now, too.  One, you've kind of apologized, which is --

22    tells me something about you to your family, because,

23    obviously, good families are there with people -- with

24    individuals during the good and the best of times and so,

25    hence, you have family, and children and friends here.

1          And so -- and I'm a bit old-fashioned.  I think
2    that a lot of us should probably be judged by the type of
3    examples we set and are we there for our families.  And
4    because I think you're sincere in what you say.
5          I think something that's important for me to say
6    is a lot of good moms and dads, good sons, good uncles, good
7    aunts, good parents commit crimes.
8          I was confronted by a nine year old a few years
9    ago saying, did you think my mom was a bad person because
10    you sent her to prison.  I said, no, no.  A lot of good
11    moms, good dads make mistake and commit crimes.  Judges do
12    not make moral judgments like that.
13          But on the other hand, and it's consistent with
14    something you've said and what I've read here, too, whether
15    it's now at your age of 53, or for a variety of reasons, you
16    have more reasons than a number -- than lots of people I see
17    in court, and a number of them are sitting right here now,
18    to kind of make this work.
19          And then what's important, before I kind of
20    explain how I see what is a fair sentence in the case, our
21    statistics completely contradict the unfair stereotypes of
22    convicted felons, especially when they're from a minority
23    group because -- well, these are federal statistics, state
24    statistics aren't quite like this, but 95 percent of every
25    felon convicted and sentenced to prison and coming out in

1    federal court in Minnesota are working full-time making a

2    lot -- making a lot more than minimum wage.

3         And then maybe even more importantly is a little

4    over two out of three people, even though the statistics are

5    the other way in state courts and other areas, for a lot of

6    different reasons, and they were when I was a young state

7    court judge many years ago up in the -- in northern

8    Minnesota, but when one of my closest friends was a judge

9    and chief judge up in Crookston, and recently retired from

10   the State Supreme Court here and -- Russ Anderson, but our

11   statistics say more than two out of three people sitting

12   where you're sitting if they work a program stay straight

13   and sober, they never return on a new crime.

14        Now, it's true the state statistics are flipped

15   the other way, for a lot of different reasons.  Part of it's

16   lack of funding and other issues, and not kind of working

17   with people, but two out of three people sitting where

18   you're sitting in our courts, that's our statistics, do not

19   return.

20        And so if there's no reason that you should not

21   be -- apart from what people think of the sentence today and

22   everything, there's no reason why you shouldn't be in that

23   group.  And even though it's not your responsibility, one of

24   the things you do, if you can do the things that you want to

25   do, not just for your family, but in doing those, you also

1    challenge people's unfair stereotypes of people, whether

2    they're convicted felons, from a minority group, because

3    there are -- let's face it, there are a lot of those unfair

4    assumptions and stereotypes made.  And so the -- so I've

5    taken a look at this and, yes, and I will be ordering you to

6    be screened.

7              And then one thing that I do, not unique to your

8    case, where there's identifiable mental health and alcohol

9    and drug issues, no matter what happens inside the prison

10   walls, we'll have immediate assessments done and screen you

11   as you -- prior as you come out because one of the issues

12   I've had with the Bureau of Prisons, frankly speaking, is

13   someone coming out of prison, they say, well, you've been

14   here this long, there's no need to follow up with any

15   aftercare.

16             Well, if that person was working for a reputable

17   program -- and not all BOP programs are like this, but if

18   they were working for a reputable program, whether it was

19   University of Minnesota, Hazelden, or other places, they

20   would be fired right where they stood if they said, well,

21   you're done now, you're out, no need to follow up with

22   anything, that's not how the real world works.  And a lot of

23   the --

24             So one thing that it's unfortunate, I read --

25   excuse me, in your presentence investigation, one of your

1    frustrations has been -- and to the extent it's relevant, or

2    important to the lawyers, or anybody in the courtroom,

3    Paragraph 73 on Page 19, it says, you've -- you've benefited

4    much more in your point of view from individual treatment

5    and therapy, and we'll work on that as well.  But then you

6    have been a little frustrated with some group treatment

7    settings because people sit around and complain about their

8    upbringings.

9         Well, if somebody is really working, whether in a

10   spiritual program, 12-step program, or some other

11   faith-based program, there's different kinds, that is not

12   what happens -- is supposed to happen in those meetings.

13   And I've been going to meetings for years and that just --

14   that shouldn't happen that way where people sit down and --

15   so, but we'll look at each of those issues irregardless of

16   what happens inside the prison walls, and so.

17        And the other thing is, I see you've been a little

18   frustrated with no prescription eyeglasses.  I'll order the

19   -- I'll order the Bureau to screen for that.  And,

20   obviously, you're probably aware -- before I announce the

21   sentence, you're probably aware, you don't need me because

22   I'm no expert, but especially if you're on some medication

23   to address some mental health issues, which is really a good

24   thing, then obviously you know that mixing it with even a

25   small, small amount of, whether it's marijuana, alcohol,

1    meth, cocaine, the list goes on, it's like taking poison.

2    And so that becomes crucial, too, because there's a lot of

3    very, very good medications out there.  And so we'll address

4    that issue as well.

5         And so -- and obviously I think you're probably

6    aware that as one of the pluses to some of the fancy

7    technology now at most facilities, even though some of us

8    have some exceptions to some of the fees charged to inmates

9    at facilities, you have the ability, unlike at -- well,

10   Sherburne's had some of it, too, but you have not just the

11   ability to Facetime and stuff, but they actually have, once

12   we'll hopefully get back to some type new normal, whatever

13   that is, you can actually have real visitation, as you're

14   aware of, with family apart from any of the technology

15   visits, so.

16        Well, looking at it, both based upon looking at

17   what we call the 3553(a) factors that -- that definition of

18   a fair sentence, a number of people would look at this and

19   say, well, it should be pretty simple, Judge, you should

20   give -- you got, you know, you have to have give the 180,

21   and then there's no reason why you shouldn't give some type

22   of consecutive sentence.

23        Well, based upon the -- sometimes the hard time

24   credit I give and the fact that if you do what you say

25   you're going to do and then if you don't, then it's on my

1   shoulders and yours, then I'm going to be imposing a

2   51-month sentence on the violation and I'm going to run it

3   concurrent.

4        So what they'll do is take 180 -- I think it's a

5   fair recommendation.  In fact, if somebody were to ask,

6   well, isn't it true in most similarly-situated cases it

7   would be more likely to be -- some or all of it to be

8   consecutive?  True.  But I think looking at all of the

9   factors that -- especially when I can go to a five-year

10  period of supervised release -- and you can ask your -- you

11  know this, you probably don't have to ask your lawyer in

12  private, but our probation officers, including Stephanie

13  Thompson and others, yes, they enforce the rules, but the

14  ones I work with are usually the last ones to give up on

15  someone, as well.  And because it's -- that's what the best

16  probation officers do.  And I would challenge anybody who

17  states that, well, they just look for technical violations

18  so they can send people away, that's not the people that I

19  work with, so.

20       And then, of course, the prosecutor has acted

21  contrary to the unfair stereotypes, in a good way he has,

22  unfair stereotypes where because the -- obviously, probably

23  the safe way out with him would be say, well, it's clear, go

24  for the maximum sentence, everything consecutive.  And that

25  hasn't happened either.

1           And so you owe me nothing, and probably nobody in

2      the courtroom except your family and those around you, but

3      let's make this work.  Because as contrary to what some

4      people think, our statistics, as I've already said,

5      contradict and challenge all these unfair stereotypes.

6      People sitting where you're sitting, two out of three never

7      return.  And that's just a fact of -- and that's our

8      statistics.  And we really try to work -- work on that and

9      so we -- there's no reason why you shouldn't be in that --

10     in that group.

11          Now, obviously it's true if -- with the conditions

12     I'll put in, your -- your decision to use any alcohol or

13     drugs, you would obligate the Judge, whether it's me or

14     somebody else, to look at additional prison time.  And I'm

15     not saying that would serve your best interests, but that's

16     not the test, either.

17          And so I'm hoping that you're kind of at a

18     crossroads, and I think you are, and I think that -- I think

19     that Ms. Hunter believes that you are, too.  So I'm -- I'm

20     really hoping we can make this work.

21          So with that in mind, what I'll do is impose a

22     sentence and then come back and ask if there's any requests

23     for clarification.  And then we'll specifically address the

24     recommendation for facility, and kind of what I'm familiar

25     with what's been happening in the context of the COVID-19

1    situation.

2          As the sentence of this Court and judgment of the

3    law, I commit you to the custody of the Bureau of Prisons

4    for a period of 180 months.

5          And then I also at this time, before I go to the

6    conditions of that -- of the newest sentence on the charge

7    you have, I'll use the phrase, conditionally pled guilty to.

8    And then I'll define that by law for appeal purposes.

9          Then on the violation, I impose a sentence of

10   51 months, direct that that run current with the 181-month

11   sentence.  And then upon the expiration of that time, that

12   file will be closed.  And that's the -- that addresses that.

13         I impose no fine, given your financial

14   circumstances.

15         And do we -- and I think we've taken care of the

16   forfeiture issue, counsel, on the weapon that's not an

17   issue, I believe?

18         MR. WESLEY:  I don't believe it's an issue, Your

19   Honor.

20         THE COURT:  Do you agree with that, defense

21   counsel, that's not an issue?

22         MR. CORNWELL:  It's not an issue.

23         THE COURT:  All right.  The Court imposes a term

24   of five years of supervised release, which is the maximum

25   without making any promises to you.

1          We have cases where someone is 100 percent

2     compliant and living the life they want to live with all our

3     conditions.  It's not unusual for us, often times, to

4     shorten that by a year or more these days, and sometimes

5     more depending on how people are doing, but it's also our

6     responsibility to help people make the transition into the

7     community.

8          Now there's certain -- as you're aware, so-called

9     mandatory conditions, but most of these would be put into

10    effect any way.

11         First, you shall not commit any crimes, be they

12    federal, state or local.

13         Second, you may not unlawfully possess a

14    controlled substance unless something is prescribed by your

15    medical provider, then you should follow those

16    recommendations.  And you'll be tested once within two weeks

17    of your release from prison.  And I would have this

18    condition on if no alcohol or drug use.  And then two

19    additional times, and I'll get to that in a moment.

20         Now some people have asked me, but you haven't,

21    well, what about -- well, what about marijuana?  Well, right

22    now the feds and the state people can't get together on that

23    because it's still a federal crime.

24         And, yes, there's some very legitimate medical

25    uses for marijuana in the THC levels in the marijuana today,

1    compared to the cornsilk that I used when I was a young

2    person, apart from other drugs, are two different things.

3            And Colorado needs to be proud because they have

4    more people in inpatient treatment for THC addiction then

5    any other state in the country.  And so, yes, still think

6    the feds and the state have to get that worked out because

7    there are some very legitimate limited medical uses for it.

8            And, actually, they decriminalized the use of

9    marijuana decades ago, so if we're out smoking dope together

10   out on the highway, as long as we have less than an ounce on

11   us, it's a petty misdemeanor.  And so sometimes I'm asked

12   about that.  And the feds and the state people are still

13   trying to work that out.

14           You shall cooperate with the collection of a DNA

15   sample as every federal defendant has since -- and maybe

16   you've already given one back because that's been in

17   effect since October of 2004 for criminal identification

18   purposes.

19           Now, the next condition, if it happens, it's a

20   so-called mandatory condition, it would be the first time in

21   my 22 years here as a federal judge, if no one has planned

22   your release and said, out the door, we're done -- and I've

23   never seen that happen, it's happened sadly in state court

24   with some frequency, but I've never seen it happen in any of

25   my cases here, and it happened when I was a state judge

1    years ago up north, too, but the -- if no one's planned your

2    release and they say out the door, then within three days of

3    your release you shall check in or report to a U.S.

4    Probation Officer.

5         Now I'll move on to the specific conditions that I

6    think are not only fair but serve your best interests:

7         You will -- we'll direct that you complete an

8    immediate assessment to participate in any recommended

9    program to address alcohol or drug use, including inpatient

10   treatment, outpatient treatment, support group work,

11   individual therapy or counseling.

12        And no matter what the Bureau of Prisons says,

13   even if you complete successfully the RDAP Program, until --

14   and I won't substitute my judgment for an expert assessor or

15   evaluator, but until I'm otherwise convinced, you shall

16   participate at least either one 12-step meeting per week, at

17   a minimum, or -- and some people want a spiritually-based

18   program, that's different -- some people misconstrue a

19   12-step program, it's not a faith-based program.  Some are

20   like the Teen and the Adult Challenge, but for a lot of

21   people a higher power's the group.  But there's a spiritual

22   group -- and I've dealt with some individuals who have a

23   different spiritual group, we do those or I approve those

24   all the time, and then make a good faith effort to have a

25   mentor or a sponsor.  And we'll work with you on that, but

1   we'll get an assessment done.

2           Secondly, and unrelated to that, I'll direct that

3   you participate in any assessment, recommended

4   psychological, or psychiatric counseling or treatment.

5           And that will be -- and we must be fair about how

6   we screen for that because if -- if a defendant felt that,

7   well, Jeez, they're having us do all these things and I need

8   to come in front of the Judge because this is ridiculous,

9   that probably happens in probably one out of hundreds of

10  cases.  I can't remember the last time that happened.  That

11  gets worked out.  So we'll screen that.

12          And then sometimes, especially with all of us, the

13  male folks in America, this kind of macho image we're all

14  supposed to have, sometimes there are grieving and other

15  counseling issues, too, that we try to screen for and have a

16  more progressive, proactive wellness philosophy.

17          And so you'll be screened for those issues.  And

18  as I've already said, you'll follow the recommendations for

19  any medication that your medical provider recommends.

20          And then I'll ask the Bureau of Prisons to screen

21  for prescription eyeglasses in the case.

22          And, of course, what's implied here, too, is a

23  condition you shall completely abstain from the use of

24  alcohol and other drugs, unless something is prescribed by

25  your medical provider.

1          I'll also impose a $100 special assessment for the

2    Crime Victims Fund, which cannot be waived or suspended.

3    And that was the law back in 2006, too.  It goes into a

4    general fund of victims of crimes.

5          And they'll -- if you're working at UNICOR or

6    nonUNICOR program at the Bureau of Prisons facility, they'll

7    sometimes withhold if you're getting income from that, $25

8    on a quarterly basis to pay that -- excuse me, and so we'll

9    -- that's usually a nonissue, as well.

10          You have a right to take an appeal from the case.

11    And let me explain that.

12          You have waived your right to appeal the sentence

13    as long as it's 180 months, no more than 180 months, which

14    is the case.

15          You have preserved your right to appeal under the

16    rules the search and the issue that was decided by the

17    magistrate judge and affirmed by me with respect to what led

18    to the arrest and the charges.  And so if you choose to

19    appeal the case, the notice of appeal must be filed within

20    14 days after we file what's called our sentencing judgment,

21    which your lawyer gets a copy of, prosecutor, probation.

22    And then we send it down to Texas, along with a presentence

23    investigation.  They'll also see the report from Miss

24    Hunter.  And so we'll probably do that no later than what,

25    tomorrow?

1           MS. SAMPSON:  Tomorrow.

2           THE COURT:  Unless we're asked for some reason to

3    delay it.

4           And I think you want me to make a recommendation

5    -- make a recommendation for Minnesota, correct?

6           THE DEFENDANT:  Yes, Your Honor.

7           THE COURT:  And then absent objection, I know

8    there won't be an objection from government, but -- and I'm

9    quite certain there won't be one from you or your attorney.

10   And I'd like to think the Bureau of Prisons carefully looks

11   at this and I'll just leave it at that but I usually would

12   put in there, I hereby recommend a Minnesota facility so --

13   to be close to immediate family.

14          Because I'd like to think that -- because one

15   thing that probably applies to all human beings whether

16   they've ever been to court or not, we all do better if we're

17   fortunate to have the love and support of family and

18   friends.  And so I generally put that in there.  I'd like to

19   think that would make a difference to the Bureau of Prisons

20   and -- but they don't have to follow my recommendation, but

21   I'll recommend that.

22          And each of the facilities here in Minnesota, and

23   you're probably aware also, have the Residential Drug

24   Alcohol Treatment Program and other called vocational, and

25   other services.

1          So the -- and right now it's kind of been up in

2     the air, it varies week by week, and we maybe hear some of

3     these things that the jail about when they're transporting

4     people, depending on -- before the virus situation they were

5     taking about seven to nine days to make a decision.  Then we

6     all find out together.  In other words, they don't call me,

7     your lawyer, prosecutor, probation, we all find out

8     together.  And so the -- but now it's -- it kind of varies

9     week by week.  We get an updated report each week in terms

10    of, one, there's going to be a transport by van or by plane,

11    depending on what the designated facility is.  And so that's

12    -- the good news is is that our local -- most local

13    facilities, they've both -- the three male federal prisons

14    and one female prison in Minnesota, we've had no inmates

15    with the -- knock on wood or something, no inmates with

16    the virus.  That's not true, admittedly, across the

17    country.  And it's probably not if it's going to happen but

18    when.

19          But anything else before I go to counsel from

20    probation on any other conditions that --

21          MS. THURINGER:  No, Your Honor.

22          THE COURT:  All right.  Anything further by

23    government?

24          MR. WESLEY:  No, Your Honor.  Thank you.

25          THE COURT:  Counsel?

1          MR. CORNWELL:  Your Honor, may I just have a

2   moment to speak with Mr. Neadeau?

3          THE COURT:  Yeah.

4          MR. CORNWELL:  Thank you.

5          (Off-the-record discussion.)

6          MR. CORNWELL:  Nothing else.  Thank you, Your

7   Honor.

8          THE COURT:  Can we make this work, Mr. Neadeau?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Really.  I mean, you can think what

11   you want of some older, white guy sitting in a robe up here

12   but really I mean it when I say there's no reason why you

13   can't do the things you want to do.  And like I said, our

14   statistics contradict all the unfair stereotypes that are

15   out there.  And so I don't know why this can't work.

16          And I hope the designation, they look carefully at

17   that.  We'll put that in there because obviously then it

18   would kind of increase the ability of family, friends,

19   children, grandchildren to visit, too, so.

20          There's no reason, even in these complicated times

21   we live in, that we can't make this -- make this work, so.

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  All right.  And then I'm sure if

24   anyone has any questions from your family, friends, your

25   counsel can answer those.

1          We stand in recess.  We are adjourned.

2          THE DEFENDANT:  Thank you.

3          (Court adjourned at 2:22 p.m.)

4                    **REPORTER'S CERTIFICATE**

5

6          I, Lynne M. Krenz, do certify the foregoing
   pages of typewritten material constitute a full, true and
   correct transcript of my original stenograph notes, as they
7  purport to contain, of the proceedings reported by me at the
   time and place hereinbefore mentioned.

8

9               /s/Lynne M. Krenz
                Lynne M. Krenz, RMR, CRR, CRC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25